### THE JOHN A. HUGHES.

(Circuit Court of Appeals, Second Circuit. December 4, 1907.)

#### No. 47.

TOWAGE—LOSS OF MUD SCOW IN DUMPING—LIABILITY OF TUG.

A tug *held* not chargeable with negligence which rendered it liable for the sinking of a mud scow which it had towed to the dumping grounds, caused by the failure of the after pocket to dump its load promptly, where the weather was not so dangerous as to render it negligent to take the scows out, but the sea was so rough that the tug could not safely go alongside the scow to assist the dumping by using its hose to loosen the material as was sometimes necessary, and where the dumping was in the sole charge of the scowman who did not act under orders from the tug.

Appeal from the District Court of the United States for the Eastern District of New York.

H. L. Cheyney and Harrington Putnam, for appellant.
Albert A. Wray, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. March 17, 1903, James E. Hughes chartered his tug John A. Hughes to the Morris & Cumings Dredging Company, "to be used by them for towing mud scows between Boston Harbor and the government dumping ground, which is seaward of a straight line through Minot's Ledge and Egg Rock Lighthouses, and such other services as charterer may require in and about Boston Harbor." May 5th the tug towed two mud scows, 43 and 48, to the dumping ground, where the tow arrived about 10:15 a. m. When the tow had crossed the line inside of which dumping is not permitted, the tug blew a signal, so that the scowmen might know that they were where operations could properly begin. The scows contained six large pockets smaller at the bottom than at the top, so that when the pauls were knocked out the bottoms of the pockets opened, and the contents, by force of gravity, dumped into the sea. The practice is to empty the amidship pockets first, and afterwards the forward and aft pockets in order to keep the scow in trim as she lightens. The scowman on No. 48 testified that he did so on this occasion, but that the after pocket dumped slowly so that the scow went down by the stern, and water washed aboard and sank her.

It was testified that thick clay not infrequently does stick, and that in such cases it is usual for the tug to come close alongside and play a hose at the edges of the clay, so as to soften it, and help it out. All the witnesses agree that the tug on this occasion could not have done this because the sea was too choppy to permit her to get close alongside, and, if she had done so, being iron, there would have been great danger of breaking her steam pipes. The libel proceeded on the theory that the real negligence of the tug was in taking the tow to sea in dangerous weather, but at the trial after the libelants had rested they were given leave to amend, by alleging "that it was a fault on the part of the Hughes to proceed to sea in such bad weather as would preclude the possibility of her going alongside the scow to pump out the material if it should stick in the pocket, and not dump, and that she failed in her duty to the scow in not going alongside and pumping it out or not making an effort to do so." The district judge absolved the tug from the charge of negligence in taking the tow out in dangerous weather, and concluded his opinion as follows:

"It is not intended to hold that the Hughes should not have started out, that the way out was beset by weather or seas that would deter other than feeble or too apprehensive mariners, nor that the condition of the dumping ground necessarily precluded tows dumping at the time, but the purpose is to decide that the master was negligent in incurring the danger of dumping, if he knew that he could not aid against the result of a common incident of dumping, or that, if he was justified in dumping because he had means of aiding in necessity, he was negligent in failing to use such means. In either case the tug was negligent."

We are of opinion that the operation of dumping was in the sole charge of the scowman, and that the master of the tug did not order him to dump. No doubt, if the scow's distress was seen or ought to have been seen by those on the tug, it would have been their duty to give whatever assistance they could, but, it being admitted on all

hands that the tug could not safely go alongside, we think the master was not negligent for failing to do so.

The decree is reversed, with costs.